NICHOLAS H. K. JACKSON (Bar No. 15079)
KATHERINE B. BUSHMAN (Bar No. 15561)
KERRY SEAN COONEY (Bar No. 18342)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Phone: (801) 363-1347
Fax: (801) 363-1437
Email: njackson@disabilitylawcenter.org
       kbushman@disabilitylawcenter.org
       scooney@disabilitylawcenter.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| DISABIILITY LAW CENTER,<br><br>Plaintiff,<br><br>v.<br><br>SG BOULEVARD MULTIFAMILY LLC d/b/a CITY VIEW ST. GEORGE; AJC ARCHITECTS, PC; WASATCH COMMERCIAL BUILDERS, LLC; PEG PROPERTY GROUP, INC.; and PEG COMPANIES, INC.,<br><br>Defendants. | **AMENDED COMPLAINT**<br>(Jury Demand)<br><br>Case 2:23-cv-00146-CMR<br>Magistrate Judge Cecilia M. Romero |

Pursuant to Fed. R. of Civ. P. 15(a)(1)(B), Plaintiff DISABILITY LAW CENTER, by and through counsel, alleges and complains against Defendants SG BOULEVARD MULTIFAMILY LLC d/b/a City View St. George, AJC Architects, P.C., Wasatch Commercial Builders, LLC, PEG Property Group, Inc., and PEG Companies, Inc., as follows:

## NATURE OF THE ACTION

This is an action to redress and prevent the violation of rights under the Fair Housing Amendments Act ("FHAA") pursuant to 42 U.S.C. § 3601 *et seq.* This action is based on Defendants' failure to design and construct residential buildings in accordance with the FHAA.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 3613(a) and because this action involves federal questions regarding the deprivation of the Plaintiff's rights under the FHAA.

2. Venue for this action is proper in the United States District Court for the District of Utah, Southern Division, pursuant to 28 U.S.C. §1391(b)(2), because it is the judicial district in which a substantial part of the acts giving rise to the claims occurred, and the residential apartment complex that is the subject of this action is located in this District.

## PARTIES

3. Plaintiff Disability Law Center ("DLC") is a private, non-profit organization that has been designated by the Governor of the State of Utah as the state's Protection and Advocacy ("P&A") Agency. In this role, the DLC works to protect and advocate for the legal rights of people with disabilities across the state. The DLC is located in Salt Lake City, Utah.

4. Under the leadership of its governing board, the DLC advocates for and protects the legal rights of its members – people with disabilities in the state of Utah. For the current fiscal year, the DLC's priorities include ending the abuse and neglect of people with disabilities, increasing compliance with established accessibility requirements for

buildings and public accommodations, ending housing discrimination, ensuring full participation of people with disabilities in the electoral process, promoting community integration, increasing the availability of community-based health and behavioral health services, increasing access to appropriate and meaningful public education, and increasing equal employment opportunities for people with disabilities.

5. The DLC consults with individuals with disabilities and their family members in identifying these organizational priorities. The DLC accomplishes this by reserving space on its governing board for such individuals, providing a formal grievance process, ensuring opportunities for public comment, and other methods.

6. In furtherance of its advocacy for its disabled constituents across Utah, the DLC has committed itself to eliminating barriers to obtaining and maintaining physically accessible and integrated housing opportunities and increasing the amount of such opportunities across the state.

7. The DLC furthers this objective by providing technical assistance and information to the public and other nonprofit organizations in Utah about fair housing laws, providing informational and legal services to individuals experiencing discrimination in housing, conducting testing and other investigations of allegations of housing discrimination in Utah, and pursuing systemic relief on behalf of its constituents. The DLC also provides fair housing training to the public, publishes and disseminates educational materials to the public, and proactively mails informational materials to builders and owners of new multifamily properties throughout the state of Utah in an effort to prevent violations of the design and construction requirements of the FHAA.

8. The DLC also employs individuals as "testers," who are persons that pose as renters or other consumers for the purpose of obtaining information about the conduct of local governments, landlords, real estate companies, housing developers, agents, and others to determine whether illegal housing discrimination is taking place.

9. When conducting a testing operation into the accessibility of any given housing complex, the DLC dispatches testers for the purpose of obtaining information about the dwellings within, including by taking measurements of particular components of the common areas and individual rental units.

10. Prior to participating in a testing investigation conducted by the DLC, testers are screened and receive training from the DLC, which includes instructions on conducting tests and preparing tester report forms.

11. The DLC expends its limited personnel and financial resources to investigate and respond to discriminatory practices, which divert resources away from other DLC activities. Furthermore, the DLC plans its priorities months and sometimes years in advance; identifying violations of the law results in readjustments to these priorities.

12. The failure of a party to design and construct accessible housing injures the DLC by frustrating the DLC's mission to ensure that all people with disabilities can access housing opportunities and live in inclusive communities across Utah.

13. Defendant SG BOULEVARD MULTIFAMILY LLC d/b/a/ City View St. George ("the Owner") is a housing provider and the owner of City View Apartments ("City View"), located at 60 North 100 West, St. George, Utah, 84770. The principal address of the Owner is 180 North University Ave, Suite 200, Provo, Utah, 84601.

14. Defendant AJC Architects, P.C., is the architecture firm for City View. The principal address of AJC Architects is 703 East 1700 South, Salt Lake City, Utah, 84105. AJC Architects is an architectural design firm that has a broad client base, including federal agencies, local governments, large educational institutions, and corporations. AJC Architects calls City View "a flagship project in the historic district of St. George [that] is intended to set the tone for all future development in the area."[1] AJC Architects also claims that it "seeks to stay on the forefront of best practices for architectural design."[2] AJC Architects has been a defendant in at least one other fair housing action brought by the DLC for significant failures involving the inaccessible design of a multifamily residential property in Utah.

15. Defendant Wasatch Commercial Builders, LLC, is a construction company and the builder of City View. Its principal address is 1820 W Printers Row Suite 100, West Valley City, Utah, 84119. Wasatch Commercial Builders, LLC has built at least sixteen large, luxury apartment communities and several commercial spaces across Utah since 2007.

16. Defendant PEG Property Group is a property management company that manages City View. Its principal address is 180 North University Avenue #260, Provo, Utah, 84601. PEG Property Group manages dozens of properties across the United States. PEG Property Group is affiliated with Defendant PEG Companies, Inc.

---

[1] AJC Architects Portfolio, *City View*, www.ajcarchitects.com, https://ajcarchitects.com/portfolio-item/city-view/ (last visited April 17, 2023).
[2] AJC Architects Careers, *Join Us*, www.ajcarchitects.com, https://ajcarchitects.com/careers/ (last visited April 17, 2023).

17. Upon information and belief, PEG Companies, Inc. developed and built the City View property. Its principal address is 180 North University Avenue, #200, Provo, Utah, 84601.

18. Each Defendant participated in the design and construction process for the property at issue in this action and/or had the ability to exercise sufficient control and/or authority to undertake to remedy the property or to otherwise make the property accessible to people with disabilities. Consequently, each Defendant had an independent, non-delegable duty to comply with the requirements of federal, state, and local fair housing laws.

## STATUTORY AND REGULATORY FRAMEWORK

### *The Fair Housing Amendments Act ("FHAA")*

19. In 1988, Congress enacted the FHAA which included a design and construction accessibility requirement as part of amendments to the Fair Housing Act to prohibit discrimination on the basis of disability.[3] The legislative history of the FHAA reflects Congressional findings that steps and thresholds at building or unit entrances send the same signal to persons using a wheelchair as a posted sign saying, "No Handicapped People Allowed."[4]

20. According to the legislative history of the FHAA, Congress intended the amendments to reflect the "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream."[5]

---

[3] The FHAA uses the term "handicap" rather than "disability." Both terms have the same legal meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). This complaint uses the terms "disability" and "handicap" interchangeably. The term "disability" is more generally accepted.
[4] H.R. Rep. No. 100-711, at 5 (1988).
[5] *Id.*, at 18.

21. Improperly designed and constructed buildings often exclude people with physical disabilities, including those who use wheelchairs. In considering the 1988 amendments, Congress stressed that enforcement of civil rights laws is necessary to protect people with disabilities from the "devastating" impact of housing discrimination, including "architectural barriers" erected by architects, developers and builders who fail to design and construct dwellings and common use areas at those dwellings accessible to and adaptable by people with physical disabilities.[6]

22. Specifically, the FHAA mandates that any multi-family dwelling that consists of four or more dwelling units and is built for first occupancy after March 13, 1991 ("covered dwellings") must provide the following:

   a. At least one accessible building entrance on an accessible route;

   b. Accessible and usable public and common-use areas, which include all parts of the building beyond the individual units;

   c. Doors designed to allow passage into and within all premises in such dwellings that are sufficiently wide to allow passage by persons using wheelchairs;

   d. An accessible route into and through each dwelling;

   e. Light switches, electrical outlets, thermostats and other environmental controls in accessible locations;

   f. Reinforcements in bathroom walls that allow for the later installation of grab bars; and

---

[6] *Id.*, at 25.

      g. Usable kitchens and bathrooms such that a person using a wheelchair can maneuver about the space.

23. To give meaning to the FHAA design and construction requirements, the United States Department of Housing and Urban Development ("HUD") promulgated the final FHAA design and construction regulations in January 1989, which are codified in 24 C.F.R. § 100.205. HUD published the final Fair Housing Accessibility Guidelines on March 6, 1991, 56 Fed. Reg. 9472 ("FHAAG"), which incorporates the requirements of the American National Standard for buildings and facilities providing accessibility and usability for people with physical disabilities, A117-1-1986 ("ANSI"), the Fair Housing Act Design Manual in August 1996, which was updated in August 1998, and the Accessibility Requirements for Covered Multifamily Dwellings under the Fair Housing Act in April 2013.

## FACTUAL BACKGROUND

24. The City View project is located in the heart of downtown St. George, Utah. The complex is newly built and is comprised of two residential buildings, a parking structure, a leasing office, and one apartment that is used as a short-term vacation rental.

25. City View includes over one-hundred covered dwelling units as defined by the FHAA, ranging from studios to three-bedroom apartments.

26. The City of St. George issued a Certificate of Compliance for the leasing office in June 2020. The Certificate of Compliance was issued to the owner of City View and Wasatch Commercial Builders, LLC. The City of St. George issued Certificates of Occupancy for the South residential building in August 2019 and the North residential building in April

2020. These Certificates include various levels of the parking structure located on the premises.

27. City View offers multiple amenities for its residents, including a 24/7 fitness center, a clubhouse, a community courtyard, a parking garage, a pool and spa area, a dog park, and a dog washing station.

28. On October 29, 2021, the DLC dispatched two testers to view available apartments at City View.

29. The testers arrived at the complex around 9:40 a.m., and remained on site until approximately 10:40 a.m. While at City View, the testers observed various common areas as well as one covered dwelling unit.

30. During their visit, the testers took photographs and measurements of common areas, the unit they viewed, and the leasing office. The test revealed numerous design and construction/accessibility violations at City View.

31. As a result of the violations DLC identified in the October 29, 2021 audit, DLC testers performed an assessment of City View on November 2 and 3, 2022. This time, DLC testers viewed the model unit, the leasing office, and the community amenities. Photos, measurements, and video recordings were taken during this assessment.

32. This assessment revealed numerous design and construction/accessibility violations in dwelling units, common areas and at the leasing office.

### *Leasing Office and Mail Room*

33. The leasing office building is divided into a leasing office and a mail room that serves part of the community. The public entrance to the leasing office is inaccessible to

wheelchair users and requires visitors and tenants to ascend a step to gain entry to the leasing office from the front.

34. Rather than creating an accessible front entrance at the leasing office, City View created a ramp on the side of the building which leads directly to the mail room adjacent to the leasing office. The interior threshold for the mailroom is too high to meet accessibility standards, and the doorway between the mailroom and the leasing office is too narrow to meet accessibility standards. Thus, neither entrance to the mail room is accessible to disabled individuals in wheelchairs.

35. The ramp that runs along the north side of the office to the accessible entrance to the mail room does not have edge protection.

36. The accessible parking is located at the front of the leasing office's main entrance, rather than closest to the mail room entrance and ramp.

37. The DLC testers learned that the leasing office used to be a private residence that was recently altered to create a leasing office for the residential community.

38. Although all units at City View are in buildings with elevators that are covered by the FHAA, many of the mailboxes in the mail room are too high to be compliant with design and construction requirements.

### *Community Areas and Amenities*

39. The testers reported that the doors leading to elevators through the parking garage as approached from the leasing office closed too quickly to allow a person in a wheelchair to move through them safely.

40. The surface of the dog park was covered with artificial turf with a thick pile appearing to be too high for an adequate accessible route. The dog park at the community also contained a bench and a "selfie station" play feature with no accessible path to either.

41. Slope measurements were taken of eight sections of sidewalk on the route leading to the dog park. These slope measurements indicated that the route exceeded the maximum allowable slope for an accessible route.

42. At the dog washing station inside one of the buildings, the controls for the vacuum/dryer exceeded the maximum allowable height for accessible controls.

### *Unit 215*

43. In Unit 215, the testers observed an insufficient amount of space between the refrigerator and the opposing wall framing.

44. The testers observed that the clear floor space centered on the refrigerator was insufficient for a front or side approach in a wheelchair.

45. The in-unit patio door threshold was too high to meet the requirement for an accessible threshold.

46. When asked, the leasing agent indicated that it was unknown whether the cabinets in the kitchen were removable.

47. When asked, the leasing agent indicated that it was unknown whether the cabinets in the bathroom were removable.

48. When asked, the leasing agent indicated that it was unknown whether the walls in the bathroom were reinforced for grab bars.

49. The testers left a business card for the leasing agent and asked the agent to email them with more information about the cabinets and grab bars, but the leasing agent never emailed them with this information.

### *Parking Garage*

50. The access aisles for several accessible stalls in the parking structure were partially obstructed by permanent objects, and the testers learned that part of the parking structure was shared with an adjacent business, called the Hive 435 Taphouse. Due to the shared parking, City View's parking may not contain a sufficient minimum number of accessible parking stalls to serve City View.

### *Model Unit*

51. The threshold of the model unit's balcony door was measured at a height that is too high to meet the requirement for an accessible threshold. Additionally, the leasing agent informed the testers that the Model Unit could be used as a vacation rental for visitors of residents in the building.

### CAUSE OF ACTION

### Fair Housing Amendments Act – 42 U.S.C. § 3601 et seq.

52. Plaintiff repeats and realleges each allegation set forth in the paragraphs above and incorporates the same herein by reference.

53. Plaintiff is an aggrieved person as defined in 42 U.S.C. §§ 3602(d) and (i), has been injured by Defendants' discriminatory conduct, and has suffered damages as a result.

54. The apartment units at City View are "covered multi-family dwellings" as defined by 42 U.S.C. § 3604(f)(7).

55. Defendants designed and/or constructed the covered multi-family dwellings and common use areas at City View in violation of 42 U.S.C. § 3604(f)(3)(C).

56. As a direct and proximate result of the Defendants' failure to design and construct the above-identified covered multi-family dwellings in compliance with the accessibility requirements of the FHAA, Plaintiff DLC has suffered injury, including monetary damages.

57. As a result of the Defendants' discriminatory conduct, the DLC has been forced to redirect the attention of its staff members from their regular tasks toward identifying and counteracting the Defendants' violations of the FHAA.

58. For example, after the DLC's design and construction test was completed, DLC's limited resources were expended by submitting information requests to the City of St. George to identify City View's developer, architect, builder, and to obtain site plans for the property. Additionally, after the first test of the subject property, the DLC sought to ascertain whether the violations had been cured and to identify the scope and extent of the accessibility issues at City View. In doing so, DLC staff traveled from Salt Lake City to St. George to monitor the accessibility at City View. The attention of DLC staff was redirected from other regular activities such as training and recruiting staff, administrative tasks, providing fair housing training to the public in more populated areas of the state, and engaging in other testing and monitoring activities at other properties. These resources would not have been expended if City View had been designed and constructed in compliance with the FHAA.

59. The DLC's resources continue to be diverted due to the Defendants' violations of the FHAA, and resources have been diverted from other traditional P&A activities such as monitoring institutions for abuse and neglect, participating in other access and rights investigations, and providing counseling and advocacy services to DLC constituents.

60. As a result of the Defendants' unlawful conduct, the DLC will need to find and set aside resources to educate potential renters about the inaccessible nature of Defendants' property and any remedial efforts made to the property. The DLC will also need to find and set aside resources to increase its training, counseling and monitoring activities in the St. George area, and will be forced to monitor for design and construction violations at other properties owned, designed, or constructed by the Defendants across Utah.

61. By designing and constructing inaccessible housing, the Defendants' discriminatory practices frustrated and continue to frustrate the Plaintiff's mission to ensure that all people have equal access to housing opportunities in Utah.

62. As a direct and proximate result of the Defendants' failure to design and construct City View in compliance with the accessibility requirements of the FHAA, inaccessible dwellings have been constructed in Utah that reduce housing opportunities for persons with physical disabilities.

63. Upon information and belief, the Defendants have and continue to design and construct additional multi-family dwellings and residential properties for first occupancy after March 13, 1992, which are subject to and violate the FHAA.

64. Defendants' unlawful conduct was intentional, willful, and made in reckless disregard for the rights of others.

65. Accordingly, pursuant to 42 U.S.C. §§ 3613(a) and (c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

66. WHEREFORE, Plaintiff respectfully requests the following relief:

    a. An order and judgment declaring that Defendants' discriminatory practices violate the FHAA;

    b. An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation from:

        i. discriminating against persons with disabilities in the design and/or construction of all dwellings;

        ii. aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by applicable laws;

    c. An order and judgment requiring Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation to:

        i. make or pay for all necessary modifications to their policies, practices, and procedures of designing and constructing multi-family residential buildings to conform and comply with fair housing and civil rights laws;

        ii. train all management, agents, and employees on pertinent fair housing, civil, and human rights laws;

        iii. allow for monitoring of its future design and construction processes;

        iv. allow for periodic monitoring of the subject property to ensure compliance;

      v. retain records to allow for appropriate monitoring; and

      vi. develop a written fair housing policy to be distributed to all employees and agents;

d. An order and judgment awarding monetary damages to the Plaintiff to compensate it fully for the economic losses, diversion of resources, and interference with mission fulfillment caused by Defendants' unlawful discriminatory practices;

e. An order and judgment awarding punitive damages;

f. An order and judgment awarding Plaintiff reasonable attorneys' fees, costs, interest, and expenses incurred in prosecuting this action; and

g. Any further relief that may be just or proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury in accordance with Rule 38 of the Federal Rules of Civil Procedure.

DATED THIS 17th DAY OF APRIL 2023.

                                      DISABILITY LAW CENTER
                                      Attorneys for Plaintiff

                                      By */s/ Katherine B. Bushman*
                                           NICHOLAS H.K. JACKSON
                                           KATHERINE B. BUSHMAN
                                           KERRY SEAN COONEY