IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DISABILITY LAW CENTER,<br><br>                Plaintiff,<br>v.<br><br>SG BOULEVARD MULTIFAMILY LLC, et al.,<br><br>                Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS<br><br>Case No. 2:23-cv-00146<br><br>Judge Ted Stewart |

       This matter comes before the Court on Defendants' 12(b)(1) Motion to Dismiss for lack of standing.[1] For the reasons discussed herein, the Court will grant the Motion.

## I. BACKGROUND

       Plaintiff sues Defendants under the Fair Housing Amendments Act ("FHAA").[2] Plaintiff is the Disability Law Center ("DLC"), a private, non-profit organization "designated by the Governor . . . as the state's Protection and Advocacy ('P&A') Agency."[3] Plaintiff "advocates for and protects the legal rights of its members—people with disabilities in the state of Utah."[4] As part of its work, DLC employs "testers" who "pose as renters or other consumers for purposes of obtaining information about the conduct of local governments, landlords, real estate companies, housing developers, agents, and others to determine whether illegal housing discrimination is

---

[1] Docket No. 36.

[2] 42 U.S.C. § 3601 *et seq.*

[3] Docket No. 29 ¶ 3.

[4] *Id.* ¶ 4.

1

taking place."[5] In this case, DLC dispatched two testers to view apartments at the City View project, a complex that includes two residential buildings (City View apartments), a parking structure, and a leasing office, located in St. George, Utah.[6]

Defendants are SG Boulevard Multifamily, the housing provider and owner of the City View apartments; Wasatch Commercial Builders, LLC, the builder of City View;[7] and PEG Property Group, the property management company that manages City View.[8] Plaintiff alleges that common areas, dwelling units, and the leasing office of the City View apartments have construction and accessibility violations under the FHAA. Defendants challenge Plaintiff's standing, arguing that it fails to meet its burden under Article III and therefore the case should be dismissed.

## II. STANDARD

Under Fed. R. Civ. P. 12(b)(1), a motion to dismiss can be made on the grounds that "the plaintiff lacks standing and therefore the court lacks subject matter jurisdiction."[9] "The party invoking federal jurisdiction has the burden to establish that it is proper, and there is a presumption against its existence."[10]

---

[5] *Id.* ¶ 8.

[6] *Id.* ¶¶ 24, 28.

[7] While Wasatch Commercial Builders, LLC has not joined the Motion to Dismiss, Plaintiff's lack of standing applies equally to its claims against this Defendant.

[8] *Id.* ¶¶ 13, 15–16. Plaintiff also named AJC Architects, PC in its Amended Complaint, however, the party was subsequently dismissed from the case with prejudice. Docket Nos. 40, 42.

[9] *Baca v. Colo. Dep't of State*, 935 F.3d 887, 905 (10th Cir. 2019) (citation omitted).

[10] *Salazar v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014) (internal quotation marks and citation omitted).

To demonstrate constitutional standing and therefore invoke the court's jurisdiction, "a plaintiff must establish three things: (1) he suffered an 'injury in fact'—'an invasion of a legally protected interests which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'; (2) the injury is 'fairly traceable to the challenged action of the defendant'; and (3) it is likely the injury will be 'redressed by a favorable decision.'"[11] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice,"[12] "[h]owever, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[13]

### III. ANALYSIS

Plaintiff asserts that "[a]s a direct and proximate result of the Defendants' failure to design and construct the [City View apartments] in compliance with the accessibility requirements of the FHAA, Plaintiff . . . has suffered injury, including monetary damages."[14]

"Article III standing requires a concrete injury even in the context of a statutory violation."[15] An organization can establish standing either in an organizational capacity or representative capacity for its members. Here, Plaintiff does not assert representative standing but asserts organizational standing, arguing it was directly injured by Defendants' alleged violations.

---

[11] *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[12] *Lujan*, 504 U.S. at 561.

[13] *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020) (internal quotation marks and citations omitted).

[14] Docket No. 29 ¶ 56.

[15] *TransUnion LLC v. Ramirez*, 594 U.S. ---, 141 S.Ct. 2190, 2205 (2021) (quoting *Spokeo Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

In determining whether Plaintiff "has [organizational] standing under the Fair Housing Act, [the Court] conduct[s] the same inquiry as in the case of an individual: Has the [P]laintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?"[16] "A fair housing organization satisfies this requirement where it 'devotes significant resources to identify and counteract' a defendant's unlawful practices."[17]

In *Havens Realty Corp. v. Coleman*, the Supreme Court concluded that an organization demonstrated a concrete and demonstrable injury where the organization "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices[,]"[18] which impaired their ability to provide counseling and referral services for low and moderate income home seekers.[19] However, the Court has since clarified that when a plaintiff sues not seeking to "remedy any harm to herself but instead is merely seeking to ensure a defendant's compliance with [the] law," the plaintiff does not have standing.[20]

While circuits have employed different approaches in determining what constitutes a sufficient injury, over time, courts have narrowed what constitutes an injury sufficient to assert organizational standing.

Plaintiff advocates for a more expansive approach to organizational injury, arguing that Fifth Circuit and D.C. Circuit case law represent the minority view by requiring "an organization

---

[16] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (internal quotation marks and citation omitted).

[17] *Arkansas ACORN Fair Hous., Inc. v. Greystone Dev., Co.*, 160 F.3d 433, 434 (8th Cir. 1998) (quoting *Havens*, 455 U.S. at 379).

[18] *Havens*, 455 U.S. at 379.

[19] *Id.*

[20] *TransUnion LLC*, 141 S.Ct. at 2206; *see also Spokeo*, 578 U.S. at 341 ("Article III standing requires a concrete injury even in the context of a statutory violation.").

to make expenditures independent of an investigation or a lawsuit in order to prove diversion of resources harm."[21] Plaintiff urges the Court to instead find that diversion of resources causes sufficient injury where an organization's time is spent on investigation and expenses associated with litigation.[22]

Plaintiff relies on the Third Circuit case, *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*,[23] to support its argument. However, in that case, the Third Circuit characterizes the approach of the D.C. Circuit as better reasoned, concluding that "the pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III."[24] More recently, in *Blunt v. Lower Merion School District*,[25] the Third Circuit reiterated that "organizations may not satisfy the injury in fact requirements by making expenditures solely for the purpose of litigation."[26]

Plaintiff also relies on case law from the Second and Seventh Circuit to support the approach that "an organization's time spent on investigation and expenses associated with litigation constitute a diversion of resources."[27] However, more recently, the Second Circuit found that where the plaintiff alleged that "it expended resources to counteract illegal activity

---

[21] Docket No. 39, at 10.

[22] *Id.* at 8–9.

[23] 141 F.3d 71 (3d Cir. 1998).

[24] *Id.* at 79–80 (citing *Spann v. Colonial Vill., Inc.*, 899 F.2d 24 (D.C. Cir. 1990); *Fair Emp. Council of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C. Cir. 1994)).

[25] 767 F.3d 247 (3d Cir. 2014).

[26] *Id.* at 285 (citing *Fair Hous. Council of Suburban Phila.*, 141 F.3d at 75).

[27] Docket No. 39, at 8–9 (citing *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990)).

touching on its core mission and in so doing diverted resources away from other activities,"[28] the court would "reject such an expansive concept of organizational injury for standing purposes."[29] The court concluded that the challenged action "must impose a cost (e.g., in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission."[30]

As such, contrary to Plaintiff's analysis, the majority of circuits have adopted a narrowed view of organizational standing. Further supporting this approach, the Fifth Circuit concluded that organizational standing was lacking where the claimed expenditures were either litigation-related or no different than the organization's ongoing activities.[31] Additionally, the D.C. Circuit has concluded that while "[t]he diversion of resources to testing might well harm the [organization's] other programs,"[32] "[when] this particular harm is self-inflicted; it results not from any actions taken by [defendants], but rather from the [organization's] own budgetary choices. Indeed, it is not really a harm at all; assuming that [defendants'] actions did not have any other effect on the [plaintiff's] programs independent of its effort to increase legal pressure."[33] This Court adopts the D.C. Circuit's reasoning that,

> [a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation. *Havens* makes clear however, that an organization

---

[28] *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021) (internal quotation marks and citations omitted).

[29] *Id.*

[30] *Id.* 173–74.

[31] *NAACP v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010).

[32] *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994).

[33] *Id.* 1276–77.

establishes Article III injury if it alleges that purportedly illegal action increases resources the group must devote to programs independent of its suit challenging the action.[34]

While the Tenth Circuit has not addressed organizational standing under Article III, district courts within the circuit have and adopted similar reasoning.[35]

Here, Plaintiff asserts its mission as follows:

- "DLC works to protect and advocate for the legal rights of people with disabilities across the state."[36]

- "DLC's priorities include ending the abuse and neglect of people with disabilities, increasing compliance with established accessibility requirements for buildings and public accommodations, ending housing discrimination . . . ."[37]

- "In furtherance of its advocacy for its disabled constituents across Utah, the DLC has committed itself to eliminating barriers to obtaining and maintaining physically

---

[34] *Spann*, 899 F.2d at 27–28 (citations omitted).

[35] *See Progeny v. City of Wichita, Kan.*, No. 6:21-CV-01100-EFM-ADM, 2022 WL 93406, at *8 (D. Kan. January 10, 2022) (concluding that spending resources to assist individuals designated as gang members on the gang list was within the ordinary interest of the organization in line with the organization's goals to "empower young people . . . [in] contact with the criminal justice system and provide . . . [them] with counseling and support," and therefore the injury was insufficient to establish standing); *Hernandez v. Monarch Real Est. Corp.*, No. CIV 08-732 MCA/WPL, 2009 WL 10707040, at *9 (D.N.M. Aug. 27, 2009) (relying in part on Second and D.C. Circuit case law to conclude that an organization plaintiff must show the defendant's action "caused [it] to deviate from its normal day-to-day operations," which a fair housing organization fails to do when its operations "already consist[ed] of receiving complaints . . . and investigating them through interviews and tests."); *Animal Legal Def. Fund v. Kelly*, 434 F. Supp. 3d 974, 996 (D. Kan. 2020) (concluding there was no diversion of resources where plaintiff could not show the defendant's action "forced it to divert its resources away from its mission when legal action [was] part of its mission.").

[36] Docket No. 29 ¶ 3.

[37] *Id.* ¶ 4.

- accessible and integrated housing opportunities and increasing the amount of such opportunities across the state."[38]
- The DLC also engages in education and training on fair housing to the public and builders and owners of multifamily properties.[39]
- "The DLC also employs individuals as testers who are persons that pose as renters . . . for the purpose of obtaining information about the conduct of local governments landlords, real estate companies, housing developers, agents, and others to determine whether illegal housing discrimination is taking place."[40] These testers receive training and take measurements of particular components of dwellings and common areas.[41]

The Amended Complaint asserts the following injuries: "The DLC expends its limited personnel and financial resources to investigate and respond to discriminatory practices, which divert resources away from other DLC activities."[42] Additionally, "DLC plans its priorities months and sometimes years in advance; identifying violations of the law results in readjustments to these priorities."[43] "The failure of a party to design and construct accessible housing injures the DLC by frustrating the DLC's mission to ensure that all people with disabilities can access housing opportunities and live in inclusive communities across Utah."[44] In its Opposition, Plaintiff also asserts that after the initial test on the property at issue was

---

[38] *Id.* ¶ 6.
[39] *Id.* ¶ 7.
[40] *Id.* ¶ 8.
[41] *Id.* ¶¶ 9–10.
[42] *Id.* ¶ 11.
[43] *Id.*
[44] *Id.* ¶ 12.

completed, it expended resources by sending information requests to St. George to identify the developer, architect, builder and to obtain site plans for the property. It also sought to ascertain if the violations had been cured, and DLC staff traveled to St. George to monitor accessibility. As such, staff was redirected from regular activities of training, administrative tasks, recruiting, and "engaging in other testing and monitoring activities at other properties."[45] Finally, Plaintiff asserts that as a result, "DLC will need to find and set aside resources to educate potential renters about the inaccessible nature of the Defendants' property."[46]

In support of its assertion of standing, Plaintiff first argues that the failure of Defendants to design and construct accessible housing injures Plaintiff by frustrating its mission that all people with disabilities can access housing opportunities and live in inclusive communities across Utah. This assertion fails to demonstrate a concrete or cognizable injury. Plaintiff does not show how the failure of Defendants has "frustrated its efforts to fulfill its mission."[47] Plaintiff argues that as a result of Defendants' conduct it "will need to find and set aside resources to educate potential renters about the inaccessible nature of Defendants' property . . . . [and] will [ ] need to find and set aside resources to increase its training, counseling and monitoring activities in the St. George area." These purported injuries are "some day intentions" that "do not support a finding of the actual or imminent injury" required.[48]

Second, Plaintiff argues that Defendants' actions result in a diversion of resources resulting in injury to the organization. Plaintiff states that due to the testers' findings at City View, it had to divert its attention from its regular activities, including "engaging in other testing

---

[45] Docket No. 39, at 4.

[46] *Id.*

[47] *Blunt*, 767 F.3d at 286.

[48] *Lujan*, 504 U.S. at 564 (internal quotation marks omitted).

and monitoring activities at other properties."[49] As such, monitoring and testing properties fall within Plaintiff's "regular"[50] activities and therefore do not constitute a diversion of its resources. Even if the additional testers and monitoring were outside of normal activity and thereby diverted resources, these activities are being conducted in preparation of litigation, and as detailed above, a plaintiff cannot "create injury in fact by bringing a case."[51] Therefore, Plaintiff fails to assert sufficient injury to support a finding of standing under Article III and the Court will grant the Motion and dismiss the case for lack of standing.

## IV. CONCLUSION

It is therefore

ORDERED that Defendants' Motion to Dismiss (Docket No. 36) is GRANTED.

DATED November 7, 2023.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[49] Docket No. 39, at 4.

[50] *Id.* ("The attention of DLC staff was redirected from other regular activities such as . . . engaging in other testing and monitoring activities at other properties.").

[51] *Spann*, 899 F.2d at 27–28; *see also Fair Hous. Council of Suburban Phila.*, 141 F.3d at 78 (concluding that that the diversion of resources to litigation without more is insufficient to confer standing under Article III).